UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Lauren L.,

          Plaintiff,

v.

Martin O'Malley[1], Commissioner of Social
Security,

          Defendant.

Civil No. 3:23-CV-00682 (MPS)

July 31, 2024

## <u>RECOMMENDED RULING ON PENDING MOTIONS</u>

Plaintiff, Lauren L.[2], appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), denying her application for Title II Disability Insurance Benefits ("DIB"). ECF No. 1. She moves for an order reversing the Commissioner's decision or, in the alternative, for an order remanding the case for a new hearing. ECF Nos. 1 at 4, 15-1 at 34. The Commissioner moves for an order affirming that decision. ECF No. 20.

For the reasons stated below, the Court recommends that Plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a

---

[1]    When Plaintiff filed this action, she named the then-Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, as defendant. Compl., ECF No. 1. Acting Commissioner Kijakazi no longer serves in that office. Her successor, Commissioner Martin O'Malley, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]    Pursuant to D. Conn. Standing Order CTAO-21-01, Plaintiff will be identified solely by first name and last initial throughout this opinion.

Hearing be DENIED (ECF No. 15) and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner be GRANTED (ECF No. 20).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On September 30, 2020, Plaintiff filed an application for DIB benefits under Title II.  (R. 31, 86.)  She claimed that she could not work due to depressive disorder, bipolar disorder, anxiety disorder, obsessive compulsive disorder ("OCD"), Tourette syndrome, epilepsy, and right foot drop. (20 C.F.R. § 404.1520; R. 32, 87.) She alleged a disability onset date of January 1, 2015. (R. 29, 86.)  Her applications were denied initially on March 9, 2021 (R. 29, 86-95), and upon reconsideration on August 6, 2021 (R. 29, 96-108.)  On February 25, 2022, the ALJ issued an unfavorable decision. (R. 29–39.)

ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims and ALJ Ronald J. Thomas's written decision followed that format. At Step One, he found that Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2024 and had not engaged in substantial gainful activity since January 1, 2015, the alleged onset date. (R. 31.) At Step Two, he found that Plaintiff suffers from the severe impairments of depressive disorder, bipolar disorder, anxiety disorder, OCD, Tourette syndrome, epilepsy, and right foot drop. (20 C.F.R. § 404.1520(c)); R. 32.)  At Step Three, he concluded that Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the "Listings" – that is, the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1. (R. 32–33.) He then determined that, notwithstanding her impairments, Plaintiff retained the residual functional capacity to:

> [P]erform light work[3] as defined in 20 CFR 404.1567(b) except that she is further limited to: occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing, but no climbing of ropes, scaffolds, or ladders; must avoid hazards such as heights, vibration, and dangerous machinery, but is able to drive personal vehicles. She is capable of performing simple, routine, and repetitious work that does not require teamwork or working closely with the public. The claimant is further limited to occasional interactions with coworkers and supervisors, and no public interaction.

(R. 33.) At Step Four, the ALJ found that Plaintiff is unable to perform any past relevant work (20 C.F.R. § 404.1520). (R. 37.) Finally, at Step Five, the ALJ relied on the testimony of a vocational expert ("VE") to find that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including "mail clerk", "marker", and "garment bagger". (R. 38–39.) Accordingly, the ALJ determined that Plaintiff was not disabled from January 1, 2015, the alleged onset date, through February 25, 2022, the date of the decision.[4] (R. 39.)

---

[3]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Social Security Ruling 83-10 further explains:

> Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (S.S.A. Jan. 1, 1983).

[4]    The relevant period under review for Plaintiff's DIB benefits runs from January 1, 2015, her alleged onset date, through the date of the ALJ's decision, February 25, 2022. (R. 29.) 20 C.F.R. §§ 404.130, 404.315(a) (2021); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989). Plaintiff's date last insured for DIB is March 31, 2024. (R. 31.)

## II.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)). To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.* At Step Three, the ALJ evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in the regulations. *Id.* At Step Four, the ALJ uses a residual functional capacity ("RFC") assessment to determine whether the claimant can perform any of his or her "past relevant work." *Id*. At Step Five, the ALJ addresses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.* The claimant bears the burden of proof at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A

district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .") (citations omitted). Though the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. In other words, district courts do not defer to the Commissioner's decision where "an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks and citations omitted). "'Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision.'" *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### III.    DISCUSSION

Plaintiff raises two main arguments on appeal. First, she argues that the ALJ "minimized and misunderstood [her] fluctuating illnesses, resulting in reversible credibility findings." ECF No. 15-1 at 26–29, 32–33. Second, she claims that the ALJ improperly evaluated the medical opinion evidence. *Id.* At 29–33. The Commissioner disagrees and argues that the ALJ did not commit legal error and substantial evidence supports his conclusions. ECF No. 20.

For the reasons that follow, the Court recommends affirming the ALJ's ruling.

### A.  Credibility Determination

Plaintiff first argues that the ALJ erred in assessing her credibility with respect to her symptoms. She contends that the ALJ did not understand the "complicated interplay" between her impairments—bipolar disorder, OCD, epilepsy, and Tourette syndrome—and did not consider the fluctuating nature of those impairments. ECF No. 15-1 at 26. In making a credibility finding, she also argues that the ALJ erred in evaluating her subjective complaints of pain, activities of daily living, and work activity. *Id.* at 30-32*.* The Commissioner argues that "[t]he ALJ reasonably found that Plaintiff's testimony concerning the intensity, persistence and limiting effects of her symptoms was not entirely consistent with the evidence of record and substantial evidence supports the ALJ's finding." ECF No. 20-1 at 4. The Court agrees.

The Regulations set forth a two-step process that an ALJ must follow in evaluating a plaintiff's subjective complaints. SSR 16-3P, 2017 WL 5180304, at *2 (SSA Oct. 25, 2017). First, the ALJ must determine whether the record demonstrates that plaintiff possesses a "medically determinable impairment that could reasonably be expected to produce [plaintiff's] symptoms, such as pain." 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16-3P, 2017 WL 5180304, at *3. Second, the ALJ must assess the credibility of plaintiff's complaints regarding "the intensity and

persistence of [plaintiff's] symptoms" to "determin[e] the extent to which the symptoms limit [plaintiff's] ability to perform work-related activities." 20 C.F.R. §§ 404.1529(c), 416.929(c), SSR 16-3P, 2017 WL 5180304, at *3.

"'Credibility findings of an ALJ are entitled to great deference [by a reviewing court,]'" *Talyosef v. Berryhill*, No. 3:17-cv-01451 (KAD), 2019 WL 4017025, at *5 (D. Conn. Aug. 26, 2019) (quoting *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997)), in large part "because the ALJ had the opportunity to observe plaintiff's demeanor while testifying." *Marquez v. Colvin*, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (citing *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994)). Thus, a district court will not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order), and where the finding is supported by substantial evidence. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

Where an ALJ rejects a claimant's testimony as not credible, the basis for the finding must be set forth "with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citing *Carroll v. Sec'y of Health & Hum. Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)). Further, an ALJ's credibility determination cannot be based on unsupported interpretations of raw medical evidence or mischaracterizations of the record. *Henderson v. Berryhill*, 312 F. Supp. 3d 364, 369 (W.D.N.Y. 2018).

At the time of the hearing, Plaintiff testified that she was working part-time as a hairdresser. (R. 62.) She stated she lost over 120 pounds a year and a half ago through exercise, eating right, and attending Weight Watchers meetings. (R. 63, 67–68.) She testified that she experiences physical symptoms from Tourette syndrome such as low back jolts and spasms with every step she

takes. (R. 59, 61.) She is "in pain every day." (R. 61.) She also testified that she has epilepsy and wears a brace for right foot drop. (R. 60, 73, 76.)

Plaintiff testified that she receives mental health treatment from Dr. Jaziri every two weeks and therapy from Jill Millea. (R. 60–61.) She received Transcranial Magnetic Stimulation ("TMS") treatment for anxiety that she claims made it worse. (R. 75.) She stated that although work is a five-minute drive, she spends "probably 15 hours a day maybe more in [the] car not driving" but writing "lists of life" due to OCD. (R. 65, 69–76.) She stated she experiences "[a] lot of racing thoughts over, and over, and over in a loop all the time, never any rest, ever." (R. 73.) "I get very, very scared. I get anxious. I get upset and I'm not able to focus." (*Id.*)

### 1. *Evaluation of Physical and Mental Health Symptoms*

The ALJ explained his reasons for discounting Plaintiff's statements concerning the intensity, persistence, and limiting effect of her physical and mental limitations with citations to her testimony, her reported symptoms to treatment providers, the opinions of State agency consultants, and the medical evidence of record.

Regarding her physical symptoms, the ALJ noted that Plaintiff's medical records demonstrated that although she had "some physical limitations" there were no "clinical deficits of strength, limited ranges of motion, or gait such that the claimant would be unable to perform the exertional demands of light work." (R. 36.) The ALJ found that her "medical records consistently noted intact musculoskeletal strength and sensation, as well as stable Tourette syndrome with medication regime, [which] mitigates against the extent of [Plaintiff's] allegations." (*Id.; see also* R. 35.)  The ALJ considered the treatment records referencing right foot drop. He noted that although she wore an orthotic brace, the medical records overall indicated "normal gait with no motor deficits," "no clinical deficits of strength, limited range of motion, or gait," (R. 35 (citing

R. 392; *see also*, R. 397, 401, 1122 (same)); R. 918 (reporting "exercising 5 days a week"); R. 36 (citing R. 692–700 (documenting need for orthotic brace for right foot drop and noting that "patient ambulates without discomfort).) The ALJ considered treatment records for epilepsy. He noted that Plaintiff experienced four seizures in her life, 2001, 2002, 2014, and 2021, noting that EEGs and MRIs of the brain were normal. (R. 35 (citing R. 1119–20; 1071.)  Her treating neurologist noted on January 19, 2021, that she experienced "no seizure since 2014 until 1/16/2020. I do think that the convulsion she had was due to multifactorial reason[s] mainly lowering seizure threshold that led to a breakthrough seizure[] especially that she abruptly stopped the alcohol medication. [I] do not think TMS ["transcranial magnetic stimulation"] caused seizure."  (R. 35 (citing R. 1253).) With regards to Tourette syndrome, the ALJ noted normal findings in physical examinations throughout the record, with no motor deficits, (R. 35 (citing R. 425, 921,1105-1106, 1115); R. 36 (citing R. 1219–1220); normal musculoskeletal bulk and tone with full 5/5 strength throughout, (R. 1122); normal gait, (R. 1100, 1122).)

The ALJ also reviewed 2019 treatment notes where Plaintiff reported worsening of Tourette symptoms when she is under stress (R. 35 (citing R. 1079)), and August 2021 reports of "new tics in her low back resulting in pain" (R. 35 (citing R. 1219).) On examination, the ALJ noted that while Plaintiff "demonstrated occasional tics involving neck, shoulder, lower back" she "otherwise had normal extremity tone, strength, and reflexes, with normal gait" and "[a]dditional movements were not noted, including no resting, postural, kinetic, or intentional tremors." (R. 35–36 (citing 1220).) On August 11, 2021, Plaintiff was referred for Botox injections for "low back tics". (R. 1220; *see* R. 1231-8/30/2021-received Botox injection).) Plaintiff cites to no treatment records for follow-up care for back pain.

The ALJ further discounted Plaintiff's reported mental health symptoms because the "mental health treatment notes indicate[] that her overall symptoms appear well controlled with medication compliance." (R. 36 (citing, *e.g.*, R. 1255 (12/9/2020), R. 539-651(citing Dr. Jaziri's treatment records from 9/25/2019-2/16/2021); *see* R. 35 (citing R. 425 (1/11/2019-noting "normal behavior and thought content"); (citing R. 921 (11/23/2020-noting "normal psychiatric findings.").) While the ALJ acknowledges "that the claimant has some limitations in maintaining concentration or focus[,] psychiatric treatment notes in the record consistently reported normal attention span, no signs of cognitive difficulty, and intact insight and judgment." (R. 32-33 (citing R. 570–651, 714, 1111, 1116, 1122).) The ALJ notes that "the claimant has some difficulty interacting with others, as such, the assessed residual functional capacity (RFC) has further restriction in social interactions." (R. 36.) However, the ALJ concludes that "[f]urther limitation is not warranted as there is no evidence that the claimant exhibits aggressive, paranoid, or severe antisocial behavior[, and the medical records consistently shows] normal behavior, mood, and affect, and no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." (R. 32 (citing R. 425, 441, 570–651).) There are a few treatment records noting some of the above behaviors. They are, however, remote in time and isolated complaints as compared to the mental health treatment records as a whole. (*See, e.g.,* R. 747–748 (8/12/2015-Plaintiff presents as crying, hostile/angry, unhappy, with mood swings, paranoia, anxiety, overwhelmed, auditory hallucinations, and sleeping 20 hours a day); R. 390–392 (7/21/2017-reporting anxiety, irritability, memory problems with "normal mood/affect" noted by doctor); R. 1092 (5/23/2019-reporting an anxiety attack the day before not helped by 1mg of Clonazepam); R. 1056 (7/25/2019-reporting crying and yelling at people nonstop for months and seeing double); R. 627 (10/1/2020-Plaintiff reports increase in OCD symptoms—lists not mentioned).)

The ALJ reviewed mental health treatment records from 2014 through 2021. (R. 36.) He noted that in 2014, while obtaining treatment for alcohol use,[5] "psychiatric exam findings noted intact memory, attention, and fund of knowledge, with normal thought process and poor judgment and insight." (R. 36 (citing R. 503–509).) In 2015, she was discharged from a substance use and Klonopin detox program after one month. (R. 36 (citing R. 703, 709).) From September 2019 to February 2021, psychiatric treatment notes "consistently documented stable mental status findings, including intact memory, stable mood, normal speech, intact thought process and content, normal attention span, and intact insight and judgment." (R. 36 (citing R. 539–653).) Further, in 2019, the medical reports show claimant began TMS (transcranial magnetic stimulation) for depression, which worked, and in 2020 psychiatric notes show TMS treatment also improved Plaintiff's anxiety and moods. (R. 36 (citing R. 1006, 609).) "Treatment notes in 2021 [also] consistently reported that her symptoms were well controlled on the current medication regime." (R. 36 (citing R. 642–651); R. 33.)

Regarding treatment for OCD, the ALJ noted that "mental health treatment notes indicates that her overall symptoms appear well controlled with medication compliance." (*See* R. 36 (citing e.g. R. 1255 (12/9/2020-"With regards to OCD, she does lists, checking, and cleaning behaviors which are somewhat under control.").) The substantial evidence supports his finding. Although the Plaintiff testified to making lists that force her to spend up to fifteen hours in her car per day, her mental health treatment providers only mention lists in passing. (R. 64, 69–72; *see, e.g.,* R. 712, 1207, 1255).)

---

[5]     The ALJ noted that Plaintiff has a past history of alcoholism. "Regarding substance use[], [Plaintiff] testified that she is a recovering alcoholic and has not used alcohol in 2 years." (*See, e.g.,* R. 34, 63 (testimony); *see generally* 20 C.F.R. § 404.1535.)

The Court is satisfied that the ALJ articulated a basis for discounting Plaintiff's credibility with "sufficient specificity" and his findings are supported by substantial evidence. *Williams*, 859 F.2d at 260-61.

### 2.    *Evaluation of Activities of Daily Living and Work Activity*

In addition to the foregoing medical evidence, the Court finds that the ALJ did not err in also considering Plaintiff's statements regarding her ability to work and activities of daily living in determining the RFC.

The ALJ explained that the medical evidence and testimony of her work activity during the disability period under review undermined her allegations of disabling symptoms. (R. 37.) The ALJ noted Plaintiff testified she was able to work part-time as a hairdresser, two days a week for a four-hour shift, which was indicative of "at least some intact functional abilities." (*Id.*) The ALJ properly considered Plaintiff's report to a treatment provider that she "does not feel the tics interfere with her job." (R. 1115.) Plaintiff testified that she lifts up to fifteen pounds, takes the stairs multiple times per hour, and stands for about two hours at a time before needing a break at her job. (R. 57, 62–63.) She is able to use a microwave but does not cook meals and eats a lot of protein bars. (R. 64, 66.) She also testified she can wash and dress herself, do laundry, use a microwave, pick up after herself, and drive to work. (R. 63–65.)

As demonstrated above, the ALJ did not rely solely on Plaintiff's reported work activity when assessing her subjective complaints of symptoms. The ALJ noted that the record contained consistent evidence of normal physical and psychiatric findings. (R. 35 (citing R. 425, 921, 1120-22).) He assessed the treatment records containing evidence that the Plaintiff's symptoms were well-controlled. (R. 35 (citing R. 1105–1106, 1115); R. 36 (citing R. 1104).) And the treating psychiatrist's notes consistently demonstrating normal and intact mental functioning with well-

controlled symptoms. (R. 36 (citing R. 503–509, 539–653, 1255); R. 32–33 (citing R. 1111, 1115–1116, 1122).)

The ALJ appropriately considered Plaintiff's reports of work activity, as made to her treatment providers, even if the work was not substantial gainful activity, in determining her functional abilities. *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."). Further, "[b]ecause symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . as to whether [a claimant is] disabled." 20 C.F.R. § 404.1529(c)(3). This includes information about a claimant's prior work record, statements by claimant about her symptoms, evidence submitted by your medical sources and activities of daily living. *Id.* The ALJ did not err when considering Plaintiff's activities of daily living, which includes her reported work activity, when determining the nature and severity of her symptoms under the regulations. *Id.; Michelle K. v. Comm'r of Soc. Sec.,* No. 1:21-cv-1295 (DB), 2024 WL 1856857, at *13 (W.D.N.Y. Apr. 29, 2024) ("The ALJ noted that Plaintiff returned to work part-time as a nurse . . ., and although the ALJ found this work was not substantial gainful activity, he nonetheless appropriately considered it in determining that Plaintiff retained the ability to work.") (citing *Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008) (summary order) (while claimant's work during the relevant period did not meet the threshold for substantial gainful activity, she worked at levels consistent with light work); *Cabrero-Gonzalez v. Colvin*, No. 13-cv-6184 (FPG), 2014 WL 7359027, at *19-20 (W.D.N.Y. Dec. 23, 2014) (finding that the ALJ appropriately discredited claimant's allegations, in part, because he worked after his alleged disability onset date)); *see also*

*Silva v. Saul*, No. 18-CV-6206 (CJS), 2019 WL 2569595, at *5 (W.D.N.Y. June 21, 2019) (collecting cases) ("An ALJ may … properly consider a claimant's demonstrated ability to work part-time during the relevant period as evidence that the claimant is not completely disabled"). "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of the witnesses,' including the claimant." *Cabrero-Gonzalez,* 2014 WL 7359027, at *20*. (quoting *Carroll,* 705 F.2d at 642); *Veino*, 312 F.3d at 588.

The Court finds that the ALJ demonstrated with "sufficient specificity" that he reviewed the medical evidence of record to assess physical and mental limitations and Plaintiff's testimony of work activity to determine that Plaintiff could perform the exertional and nonexertional demands of light work. *Williams*, 859 F.2d at 260–61.

## 2.  Fluctuating Symptoms

Plaintiff argues that bipolar disorder, OCD, and Tourette syndrome, all cause fluctuations in severity and the ALJ erred because he "did not understand[] this complicated interplay." ECF No. 15-1 at 26, 28. The ALJ addressed those fluctuations in his decision and the determination is supported by substantial evidence. *See Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (summary order) (recognizing that "a person suffering from bipolar disorder may be vulnerable to 'violent mood swings' resulting in 'better days and worse days,' and that a claimant's stability on *some* days does not necessarily support the conclusion that he is able to work *every day."* But finding that "substantial evidence in the record support[ed] the ALJ's conclusion that this plaintiff, with the proper treatment, could perform work on a regular and continuing basis.") (emphasis in original).

Here, the ALJ concluded that there were "no findings for persistent emotional lability or significant mood fluctuations[.]" (R. 33; R. 37.) He found that "the record does not demonstrate

any significant or sustained loss of cognitive functioning," (R. 32 (citing R. 570–651, 1111, 1116, 1122)), or "any significant loss of ability to regulate emotions, control behavior, or maintain well-being in a work setting." (R. 33 (citing R. 639–651).) The ALJ explained that the treatment notes consistently reported that symptoms were well-controlled and stable on medications, with normal attention span, intact judgment and no evidence showing significant limits on her ability to understand and follow short simple tasks. (R. 32–33.) "For instance, treatment notes from Dr. Jaziri consistently documented that the claimant presented with stable mental status findings, including intact memory, stable mood, normal speech, intact thought process and content, and intact insight and judgement." (R. 37 (citing R. 539–653); *see also infra* n.6.)

Regarding Plaintiff's symptoms associated with Tourette syndrome, the ALJ noted that in 2017, Plaintiff "reported that her tics have remained under relatively good control without medication, and [she] had been able to work as a hairdresser without interference from her tics." (R. 35 (citing R. 1115 ("She works as a hairdresser and does not feel the tics interfere with her job.")).) On November 14, 2018, her treatment provider noted in a telephone encounter that Plaintiff wanted to "inform the MD that she is now taking Symbyax 12-25 QD. . . but is still having sniffling flare ups." (R. 1101.) On November 27, 2018, a telephone encounter note stated "Patient is continuing to have flare ups and has had to call out of work 3 times." (*Id.*) Dr. Sara Maguire Schaefer, on November 28, 2018, made an adjustment to her medication. (*Id.*) On January 31, 2019, Plaintiff was seen by Dr. Aline Herlopian who noted that Plaintiff had "Tourette syndrome and tics where she sniffs." (R. 1099.) On physical examination, the doctor noted strength was 5/5 throughout and normal gait. (R. 1100.)

In September 2019, the ALJ noted that Plaintiff reported "her tics get worse with stress", however, upon examination she demonstrated "normal extremity tone, strength, and reflexes, with

normal gait. (R. 35 (citing 1079); *see* R. 1179-81).) Additional movements were not noted, including no resting, postural, kinetic, or intention tremors." (R. 35–36 (citing 1219–1221).) The new painful lower back tics she reported in August 2021, were treated with Botox injections. (R. 36; *see* R. 1220; R. 1231 (8/30/2021-received Botox injections to treat left and right lower back and hip spasms).) The record contains no follow-up treatment for low back pain after August 2021, nor does Plaintiff cite to additional medical records that were overlooked by the ALJ.

The ALJ did not pick out isolated incidents of improvement, but rather cited a record that consistently showed well-managed and stable symptoms. There is substantial evidence in the record supporting the ALJ's findings that "the record contains no clinical findings for loss of cognition, memory, or concentration such that claimant could not perform at least simple and routine work tasks without collaboration or teamwork." (R. 36.) Here, the ALJ demonstrated he reviewed the entire record to determine the credibility of reported symptoms and their consistency with the record. *See* SSR 16-3P, 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

Based on the specific reasons offered by the ALJ for his finding on credibility and the supportive evidence in the record, the Court finds that the ALJ resolved the evidentiary conflicts and reasonably evaluated Plaintiff's credibility. The ALJ did not err in assessing Plaintiff's credibility.

**B.  Evaluation of Medical Opinion Evidence**

Plaintiff next argues that the ALJ erred in evaluating the opinions of her treating psychiatrist and the State agency medical consultants. ECF No. 15-1 at 29-33. She contends that the ALJ improperly discounted the treating psychiatrist's opinion because he failed to "understand

the expected fluctuations of [Plaintiff's] illnesses" and afforded undue weight to her part-time job when evaluating her ability to work. *Id.* at 29-31. Plaintiff further argues that the ALJ erred in evaluating the State agency opinions because the consultants' opinions were based on an partial record. *Id,* at 31-33. The Court disagrees.

### 1.  *Evaluation of Treating Psychiatrist Dr. Kelly Jaziri's Opinion*

Plaintiff first argues that the ALJ erred in discounting Dr. Kelly Jaziri, the treating psychiatrist's opinion regarding her mental limitations. *Id.* at 29-31.

For applications filed after March 27, 2017, such as in this case, the agency need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must evaluate medical opinions based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, which focuses on the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship; (4) the specialization of the source; and (5) "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the "[m]ost important" of the five, 20 C.F.R. § 404.1520c(b)(2), and accordingly the ALJ must explicitly articulate how he considered those two factors. *See Id*. He may, but is not required to, explain how he considered the other three. *Id.*

When considering "supportability," ALJs are directed to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(1). The "consistency" factor goes to the opinion's consistency with other evidence in the record. "The more consistent a medical opinion(s)

or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

The ALJ found that Dr. Jaziri's, opinion was not persuasive "as the severe limitations opined by Dr. Jaziri are not supported by her treatment records, nor consistent with the overall medical record." (R. 37.) The ALJ's decision demonstrated supportability and consistency with the medical evidence in the record. In March 2021, Dr. Jaziri, in a mental impairment questionnaire, concluded that the claimant had fair to poor mental functioning in most of the areas assessed, and stated the claimant had an inability to concentrate and carry out moderately complex tasks. (R. 533–535.) Dr. Jaziri bases these determinations on the claimant's mood swings, severe anxiety, intermittent racing thoughts, and unpredictability. (*Id.*) However,  outside of this questionnaire, "[t]reatment notes from Dr. Jaziri consistently documented that the claimant presented with stable mental status findings, including intact memory, stable mood, normal speech, intact thought process and content, normal attention span, and intact eyesight and judgement." (R. 37 (citing R. 539–653).)[6]

---

[6]     *See e.g.* R. 570 (1/27/2020-noting "no apparent serious mental status abnormalities"); R. 573 (2/24/2020-normal mood "with no signs of either depression or mood elevation" intact memory,); R. 576 (3/17/2020)(same), R. 579 (4/16/2020-"Affect is appropriate, full range" with "signs of mild depression"); R. 582 (4/23/2020-"mental status has no gross abnormalities", "insight and judgment appear intact"); R. 585 (4/28/2020-"Mood presents as normal with no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process."); R. 588 (5/5/2020-"no apparent serious mental status abnormalities." "Neither depression nor mood elevation is evident."); R. 591 (5/12/2020-same); R. 594 (5/19/2020-same); R. 597 (5/28/2020-same); R. 600 (6/11/2020-"Mood presents as normal with no signs of either depression or mood elevation." "[B]ehavior in the session was cooperative and attentive with no gross behavioral abnormalities."); R. 603 (6/16/2020-same); R. 606 (6/22/2020-"no apparent serious mental status abnormalities. Neither depression nor mood elevation is evident."); R. 609 (7/6/2020-same); R. 612 (7/20/2020-same); R. 615 (7/28/2020-same); R. 618 (8/6/2020-same); R. 621 (8/20/2020-same); R. 624 (9/3/2020-same); R. 627 (10/1/2020-"she is calm and cooperative. Neither

Dr. Jaziri also notes that Plaintiff worked as a hairdresser from 2013–2017, 2017–2018, 2018–2019 but has not worked since. (R. 535.) The ALJ reasoned that an ability to work part-time is "indicative of at least some intact functional abilities," underscoring the record's inconsistency with Dr. Jaziri's opinions. (R. 37.) Plaintiff argues that "even when Dr. Jaziri noted 'no apparent serious mental status abnormalities,' she noted 'residual OCD symptoms.'" ECF No. 15-1 at 30 (citing R. 570-571 (Plaintiff reports residual OCD symptoms, the exam showed "no apparent serious mental status abnormalities)). Notably, Dr. Jaziri diagnosed Plaintiff with "[m]ajor depressive disorder, recurrent severe without psychotic features" throughout her treatment records suggesting that Plaintiff's symptoms did not warrant an OCD diagnosis. (R. 539 (9/25/2019)-R. 655 (6/17/2021). The doctor occasionally noted "mixed obsessional thoughts and acts" between April 16, 2020 and July 20, 2020, but also noted during that same time frame that her mental status showed no gross behavioral abnormalities. (*See* R. 582, 588, 591, 594, 597, 600, 603, 609, 612.)

Other medical providers also noted unremarkable psychological findings with "normal mood and affect" and noted Plaintiff's reported symptoms. (R. 466 (10/14/2020-noting Plaintiff reported "no depression, no alcoholism and no anxiety.")). (*See also* R. 472 (10/9/2020-noting normal mood, affect, active and alert; patient reported depression, anxiety); R. 474 (10/9/2020-Plaintiff completed a Patient Questionnaire stating she had "not at all" been bothered by "little

---

depression nor mood elevation is evident."); R. 630 (10/29/2020-same); R. 633 (11/24/2020-calm and cooperative with normal speech and attention span, logical and appropriate thinking, intact memory); R. 636 (12/7/2020-same); R. 639 (12/22/2020-same); R. 642 (1/5/2021-noting normal speech and attention span, logical and appropriate thinking, intact memory); R. 645 (1/19/2021-reported a seizure two days prior. Mental status exam revealed she was calm and cooperative with normal speech and attention span, logical and appropriate thinking, no signs of cognitive difficulty, intact memory, no apparent signs of anxiety, intact insight and judgment); R. 648 (2/2/2021-"calm and cooperative, normal speech, no apparent thought disorder, intact cognitive functioning, fully oriented, no signs of anxiety, intact insight and judgment); R. 651 (2/16/2021-same); R. 655 (6/17/2021-same).

interest or pleasure in doing things" and/or "feeling down, depressed, or hopeless."); (R. 484 (7/17/2015-denies anxiety, nervousness, or depression); R. 486 (7/23/2015-reporting no psychological symptoms, with a normal psychiatric exam); R. 492–493 (9/11/2015-normal psychiatric exam, bipolar disorder and anxiety stable); *see* SSR 16-3P, 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

The Court finds that the ALJ identified good reasons for discounting Dr. Jaziri's opinion.

### *2. Evaluation of the State Agency Opinions*

The ALJ also considered the opinions of the State agency medical consultants Dr. Virginia Ritter (R. 91-12/16/2020); Christopher Leveille, Ph.D. (R. 95-3/9/2021), and mental health consultants  Dr. Paul Barrett, Jr. (R. 106-8/4/2021) and Douglas Rau, Ph.D. (R. 107-6/22/2021) who reviewed evidence related to Plaintiff's physical  and mental impairments.

The ALJ provided reasons for finding these opinions partially persuasive. First, he explained that he accepted the "State agency psychological assessments that the claimant is capable of performing simple and routine tasks, as the record is supportive and consistent with their findings." (R. 37.) The ALJ incorporated nonexertional limitations in the RFC. (R. 33.) The ALJ disagreed with the State agency consultants' findings that Plaintiff was capable of performing work with "no exertional limitations." (R. 37.) He explained that Plaintiff was "limited to the light exertion level based upon the overall record, and considering the claimant's medical history of

epilepsy, and recent Tourette tics that have developed in her lower back." *Id.* (citing R. 1181-1273.) The ALJ incorporated exertional limitations in the RFC based on all of the evidence of record.[7]

Plaintiff raises two arguments challenging the ALJ's evaluation of the State agency opinions. First, she argues that the State agency opinions are not supportive and consistent with the record of evidence because the opinions pre-date treatment records showing "worsening tics and OCD symptoms and seizure recurrence." ECF No. 15-1 at 31 (citing R. 1220, 1231, 948).) Second, she argues that the State agency "consultants clearly did not see the later-arrived evidence regarding [her] pain" when finding "her medical/physical impairments not severe." *Id.* at 32. The Commissioner argues Plaintiff failed to demonstrate reversible error related to the ALJ's evaluation of the State agency opinions. ECF No. 20-1 at 16.

An ALJ must base their RFC determination "on all the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). When the ALJ relies on the medical opinion of someone who "did not examine [a] key piece of evidence in the record," they act in error, and their opinion is not supported by substantial evidence. *Burgess*, 537 F.3d at 131. However, the ALJ may rely on non-treating physicians and agency medical consultants so long as the opinion is "supported by medical evidence in the record." *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order). "A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age." *Palmer v. Saul*, Civ. No. 3:19-cv-00920 (SALM), 2020 WL 4731350, at *4 n.3 (D. Conn. Aug. 14, 2020) (quoting *Lesanti v. Comm'r of Soc. Sec.*, 436 F. Supp. 3d 639, 646 (W.D.N.Y. 2020)). Indeed, "a gap of time between when an opinion is

---

[7]     The exertional limitations contained in the RFC include "occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing, but no climbing of ropes, scaffolds, or ladders; [she] must avoid hazards such as heights, vibration, and dangerous machinery, but is able to drive personal vehicles." (R. 33.)

rendered and the disability hearing and the decision does not automatically invalidate that opinion," but rather only "a meaningful change in [the Plaintiff's] condition during the gap will do so." *Renee L. v. Comm'r of Soc. Sec.*, 5:20-cv-00991 (TWD), 2022 WL 685285, at \*6 (N.D.N.Y. Mar. 8, 2022) (internal quotations and citations omitted). In other words, "medical opinions are rendered stale by a new significant diagnosis or significant deterioration in the plaintiff's condition." *Id.* (citation and internal quotation marks omitted).

Here, the ALJ did not err in his evaluation of the State agency physical assessments in finding that the opinions partially persuasive and he explained why. Plaintiff points to three treatment records reporting "worsening tics and OCD symptoms and seizure recurrence" as relevant medical evidence not considered by the agency examiners. ECF No. 15-1 at 31 (citing R. 1220 (8/11/2021-reporting lower back tic was giving her pain); R. 1231 (8/30/2021-receiving Botox injections to treat left and right lower back and hip spasms); R. 948[8].) Plaintiff argues that "the ALJ must either accept the claimant's pain testimony as true or make specific findings rejecting that testimony." ECF No. 15-1 at 32. As demonstrated above, the ALJ, detailed the objective medical evidence and made specific findings regarding foot drop, epilepsy, Tourette Syndrome and related complaints of pain. (R. 35-36.) While the ALJ incorporated the nonexertional limitations the State agency doctors identified into the RFC, he also included more restrictive physical limitations in the RFC, "based upon the overall record, and considering the claimant's medical history of epilepsy, and recent Tourette tics that developed in her lower back." (R. 37 (citing 1181–1241; 1242–1274).) The ALJ provided good reasons for finding the physical

---

[8]    Plaintiff's brief indicates this record discusses the recurrence of her seizures, but the citation to the record is incorrect. R. 948 is the results of a CT exam from her radiologist. The most recent seizure is noted at R. 1251 and was not attributed to her epilepsy but instead to her abrupt stop of alcohol medication. (*See* R. 1253.)

assessments of Drs. Ritter and Barrett partially persuasive and incorporating more restrictive exertional findings in the RFC based on the medical evidence that post-dated their opinions.

With regard to the State agency psychological assessments, the Commissioner argues that "Plaintiff fails to establish how such evidence would undermine the ALJ's evaluation of the evidence from Drs. Leveille and Rau who rendered opinions regarding her mental functioning." ECF No. 20-1 at 15. Notably, Plaintiff only argues that "pain as a consequence of Tourette [s]yndrome" affected her ability to perform physical activity such as sitting and standing, not that it affected her mental functioning. ECF No. 15-1 at 32 (citing R. 76–77 ("The pain is from my Tourette's and my spasms every time I move[.]"); R. 1218-1220-8/11/2021).) The ALJ accurately found that "[p]sychiatric notes in 2021 [demonstrated] that her symptoms were well controlled and stable on medications." (R. 33 (citing R. 639–653); *see supra* n.6).) On this record, the ALJ provided good reasons for accepting the psychological assessments of Drs. Leveille and Rau and incorporated the nonexertional findings in the RFC.

The Court finds that the ALJ demonstrated with "sufficient specificity" that he reviewed the medical evidence of record to assess physical limitations, including complaints of pain, to determine that Plaintiff could perform the exertional demands of light work with exertional and nonexertional limitations. *Ferraris*, 728 F.2d at 587.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that the ALJ did not err as a matter of law and his decision was supported by substantial evidence. The Court recommends that Plaintiff's Motion for Order Reversing the Commissioner's Decision **(ECF No. 15)** be **DENIED** and Defendant's Motion for an Order Affirming the Decision of the Commissioner **(ECF No. 20)** be **GRANTED**. The Court recommends that judgment enter in favor of Defendant.

This is a recommended ruling by a magistrate judge. *See* Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with this order. *See* Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen days will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72.2(a); *Impala v. U.S. Dep't of Just.*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to magistrate judge's recommended ruling precluded further appeal to Second Circuit); *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

*/s/ Maria E. Garcia, U.S.M.J.*
Hon. Maria E. Garcia
United States Magistrate Judge